Mr. and Mrs. Lowell E. ACKMANN, Mr. and Mrs. Noble Arnold, Russell Dashow, Mr. and Mrs. Donald Gregor, Mr. and Mrs. James F. Huntington, Dr. and Mrs. Paul Jacobi, Mr. and Mrs. Linas Jurcys, Mr. and Mrs. Helmut Kanoldt, Mr. and Mrs. William Lundberg, Mr. and Mrs. Fred H. Olander, L. Douglass Piggott, Mr. and Mrs. Harold Schimanski, Mr. and Mrs. Gerald W. Schultz,˙ Mr. and Mrs. Richard Siakel, Mr. and Mrs. Ted Stockfish, Mr. and Mrs. Grant Taylor, Mr. and Mrs. Michael Toll, Mr. and Mrs. Ronald Vargason, Mr. and Mrs. Fred Weinert, Plaintiffs–Appellees and Cross–Appellants,

and

Mr. and Mrs. Roy Kopeikin and Mr. and Mrs. Philip Wangelin, Plaintiffs and Cross–Appellants,

v.

MERCHANTS MORTGAGE & TRUST CORPORATION, Defendant–Appellant and Cross–Appellee.

No. 78–795.

Colorado Court of Appeals, Div. II.

June 5, 1980.

Rehearing Denied June 26, 1980.

Certiorari Granted Nov. 3, 1980.

Davis, Miner & Barnhill, George F. Galland, Jr., Chicago, Ill., Arthur L. Fine, Denver, for plaintiffs-appellees and cross-appellants.

Davis, Moorhead & Ceriani, P.C., Gary J. Ceriani, Denver, for defendant-appellant and cross-appellee.

STERNBERG, Judge.

Defendant, Merchants Mortgage & Trust Corporation, appeals a judgment entered on a jury verdict finding that it was not a holder in due course of certain promissory notes executed by plaintiffs, that a defense of fraudulent concealment was available to plaintiffs, and that plaintiffs were therefore entitled to restitution of the amounts paid on the notes. We reverse.

Plaintiffs had purchased lots at the Woodmoor Corporation's Stagecoach development between June 22, 1972, and September 14, 1973. The lots were on undeveloped land which Woodmoor was to improve by providing electricity, sewers, roads, and other amenities, as well as recreational facilities including a ski lift, golf courses, and a lake. At the time of purchase, each plaintiff made a cash downpayment and executed to Woodmoor a promissory note for the balance of the purchase price. As part of its method of financing the project, Woodmoor negotiated the promissory notes to Merchants. In early 1974, Woodmoor filed a petition in bankruptcy and terminated operations at Stagecoach without completing the promised improvements.

Upon learning of Woodmoor's bankruptcy, plaintiffs stopped making payments on the notes and initiated this action requesting a declaratory judgment that Merchants was not a holder in due course of the notes and that the notes were unenforceable. The action also sought restitution of the amounts expended pursuant to purchase of the lots as well as other monetary damages.

Plaintiffs sought class certification under C.R.C.P. 23, but the trial court denied this motion; they cross-appeal the denial of that motion.

Plaintiffs initially asserted four "counts" under which they were entitled to relief. By stipulation, three of the "counts" were dismissed with prejudice prior to trial. Merchants counterclaimed for judgment on the notes. The case went to trial on the issues of whether plaintiffs had a defense to liability on the notes, and, if so, whether Merchants was a holder in due course.

At trial, plaintiffs asserted three theories under which they could avoid liability on the notes: (1) Violation of the Federal Interstate Land Sales Full Disclosure Act (ILSFDA); (2) failure of consideration; and (3) fraudulent concealment of material facts. Following presentation of plaintiffs' case, defendant moved for a directed verdict. The trial court granted the motion as to plaintiffs' first two theories, the claimed violation of the ILSFDA and failure of consideration. The court also granted a directed verdict on all the theories against plaintiffs Kopeikin and Wangelin, concluding that since they did not testify, they had not established a defense to their notes. With respect to the remaining plaintiffs, the court concluded that sufficient evidence of fraudulent concealment was presented to render that issue appropriate for resolution by the jury, and denied defendant's motion as to that defense. Merchants appeals the adverse verdict; on cross-appeal plaintiffs seek reversal of the judgment on the ILSFDA defense, and the failure to grant class certification; the plaintiffs Kopeikin and Wangelin challenge the judgments dismissing their claims.

After Merchants presented its case, it again moved for a directed verdict, this time asserting that the evidence unequivocally established that it was a holder in due course and was therefore not subject to any defense to the notes that plaintiffs might assert against Woodmoor. The court denied this motion. Following the jury verdicts, Merchants moved for judgment notwithstanding the verdict. This motion also was denied.

The jury found as to each note that Merchants was not a holder in due course, and, therefore, that plaintiffs were entitled to assert the defense of fraud against liability on the notes. The jury cancelled each plaintiff's liability for the unpaid principal and interest and awarded each plaintiff, with the exception of the Olanders, restitution in the amount already paid on the notes. (The Olanders' obligation was cancelled but no restitution was awarded, apparently because testimony indicated that their property had been provided some of the promised amenities, making it worth more than the other plaintiffs' lots.) All plaintiffs were permitted to retain possession of their lots.

The plaintiffs' basic factual contention is that at the time they purchased the lots in question, i. e., between June 22, 1972, and September 14, 1973, the Woodmoor Corporation's financial situation was so desperate that information relative thereto should have been disclosed to prospective purchasers, and that Woodmoor's failure to disclose this information was fraudulent under both common law principles and the ILSFDA. In support of their position, plaintiffs point specifically to what they term Woodmoor's "cash crisis": The corporation's inability to maintain a positive cash flow. Plaintiffs maintain that had they been aware of Woodmoor's cash flow problems, they would not have purchased the lots.

To establish Woodmoor's financial condition, plaintiffs' offered the testimony of two former employees of the Woodmoor Corporation, Dale Wheeler and Oscar Ted Forde. Wheeler worked for Woodmoor from May of 1969 to December of 1972, and served as corporate controller, treasurer, and vice president of finance. He had ultimate responsibility for all financial and accounting matters of the corporation. Forde worked for Woodmoor from November 1, 1972, to September 30, 1973, as corporate treasurer. He was involved in cash management, financial projections, and financing.

Both Wheeler and Forde testified that Woodmoor's standard method of financing its projects in the past was through the sale of undeveloped building lots on which they received cash downpayments of approximately 10% and promissory notes for the remainder of the purchase price. The notes were either negotiated to various financial institutions or used as collateral for loans. The proceeds were applied towards overhead and project development.

Taken in the light most favorable to plaintiffs, the evidence established that from the time Woodmoor commenced the Stagecoach development in late 1971 until its bankruptcy in 1974, it had serious difficulty maintaining a positive cash flow and had attendant difficulty keeping its accounts payable current. It also indicated that scheduled completion dates for some of the improvements at Stagecoach were not being met. Woodmoor's ability to operate depended on the financing of the notes received from its sales. Part of Woodmoor's financial difficulty resulted from its inability to negotiate certain notes it had taken on multi-family lots because of the terms of those notes. During 1972 and 1973, it searched unsuccessfully for a development loan which would have provided operating funds not dependent upon lot sales and the negotiation of notes, and which would have substantially alleviated the financial pressures on the Stagecoach project.

Wheeler testified that when he left Woodmoor in December of 1972, he was concerned about Woodmoor's cash flow problem and had "some doubt" as to whether the company was going to make it.

Forde testified that in 1972 Woodmoor made a public stock offering and that net cash flow was neither negative nor positive, but was "pretty close." He also testified that the corporation made a profit for that year, and reported an increased earnings per share of stock which he considered indicative of a strong upward trend. He testified that after he came to Woodmoor in November of 1972 he made financial projections for 1973, and concluded that, in addition to its normal financing, the corporation needed $5,000,000 to $10,000,000 in additional financing for that year. He felt that

through a public stock offering this was a realistically achievable figure, and recommended other methods of improving Woodmoor's finances, including suggestions for improving the negotiability of the multi-family lot notes. He testified that he then believed Woodmoor would be able to complete its present projects, including Stagecoach, but should refrain from starting any new ones.

Through the spring of 1973, sales at Stagecoach were excellent. During that time Woodmoor's accounts payable were increasing in size, and Forde began seeking a development loan in earnest. Also, in the spring of 1973, interest rates began to climb, and money was becoming scarce. Woodmoor began development of a new collateralization plan directed at improving its cash flow. By June or July there was a slow down in lot sales. In June, Woodmoor renegotiated a bank loan, which had come due, and in July, Woodmoor failed to make its interest payment to one of its principal lenders.

It is clear that from the beginning of the summer of 1973, Woodmoor's cash flow problems increased because of a drop in sales and difficulty in obtaining new financing. There is evidence that during this period financing was obtained, although not of the magnitude desired. There is also evidence that negotiations for development loans and for collateralization of the multi-family promissory notes were continuing, and continued through at least September of 1973. Forde testified that, in September, Woodmoor was looking for a merger partner because of its financial difficulties, and that when he left Woodmoor at the end of September negotiations were continuing for a development loan.

Merchants contends that the evidence failed to establish the defense of fraudulent concealment and that its motion for a directed verdict at the close of plaintiffs' case should have been granted. We agree.

■ A motion for directed verdict may be granted only when the evidence, and every inference which reasonably can be drawn therefrom, when viewed in the light most favorable to the party opposing the motion, compels the conclusion that no reasonable man could decide the contested issues against the moving party. *McGlasson v. Barger*, 163 Colo. 438, 431 P.2d 778 (1967). Because plaintiffs' evidence did not establish every element required for the defense of fraudulent concealment, Merchants' motion should have been granted and we accordingly reverse.

■ The elements of fraudulent concealment are discussed in the leading case of *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937). They are (a) the concealment of a material existing fact which in equity and good conscience should be disclosed; (b) knowledge that one is concealing such a fact; (c) ignorance on the part of the one from whom such fact is concealed of the existence of the fact; (d) the intention that the concealment be acted upon; and (e) action on the concealment resulting in damages. *See Teodonno v. Bachman*, 158 Colo. 1, 404 P.2d 284 (1965).

■ Precisely what information a party in equity and good conscience has a duty to disclose necessarily depends on the nature of the transaction and the character of the information he possesses. As a result of the transactions in this case, Woodmoor assumed the obligation to provide specific property improvements at designated future dates. The commitment to provide the future improvements was more than a mere expression of opinion by Woodmoor concerning the happening or non-happening of a future occurrence; it was an assertion of fact and thus could provide a basis for actionable fraud. *See Bell Press, Inc. v. Phillips*, 147 Colo. 461, 364 P.2d 398 (1961).

■ Plaintiffs do not assert, however, that when they purchased, Woodmoor had a present intention not to fulfill these future commitments. *See Stalos v. Booras*, 34 Colo.App. 252, 528 P.2d 254 (1974). Nor do plaintiffs assert that Woodmoor made any actual affirmative misrepresentation of fact, *see Teodonno v. Bachman, supra,* or concealed information requested by any plaintiff. *See Franklin Supply Co. v. Tol-*

*man*, 454 F.2d 1059 (9th Cir. 1972). To the contrary, the record reveals that a considerable amount of information regarding Woodmoor's financial condition was available to the public. A public stock offering was made in the summer of 1972 which entailed public financial disclosure. Financial data was made public in conjunction with an application for listing on the American Stock Exchange, credit reports were published by Dunn & Bradstreet, quarterly financial statements were available, certain lot sales data and financing arrangements were publicized by local newspapers, and those plaintiffs who sought financial information from Woodmoor were provided such.

■ The scienter element of fraudulent concealment requires proof of an intent to defraud. Therefore, it was incumbent upon the plaintiffs to establish that Woodmoor concealed known present or past facts which made non–performance almost certain when it committed itself to install improvements in the future. *See Morrison v. Goodspeed, supra; McNeill v. Allen*, 35 Colo.App. 317, 534 P.2d 813 (1975). *See also Colo. J.I.* 19:14 (1969); *Colo. J.I.* 19:13 (2d ed. 1980).

■ We conclude that the financing methods relied upon by Woodmoor are not, in themselves, fraudulent. Actionable fraud is not present here. Erroneous business judgment, as demonstrated in this case by the failure accurately to project a decline in lot sales, or a rise in interest rates, standing alone, does not show fraudulent concealment.

■ The fact that a land developer experiences difficulties in obtaining financing commitments while continuing to sell lots on which future improvements are promised does not amount to fraud in the absence of a showing that the principals of the business knew that the possibilities of obtaining the necessary financing were so remote, and the need for that financing so pressing, as to render the business almost certainly unable to perform its obligations. *See Morrison v. Goodspeed, supra.* The

principals must be aware of this almost certain eventuality; it is fraud if they continue to take the money of unwary purchasers knowing that in all probability they will not deliver what they have promised.

The evidence reveals Woodmoor experienced severe financial difficulties; however, the testimony of neither Wheeler nor Forde established that facts were concealed from any of the plaintiffs which Woodmoor knew indicated an almost certain inability to complete the promised improvements. Nor is there any other evidence in the record on which such a conclusion could be based. The evidence relative to Woodmoor's financial condition in 1972 is wholly inadequate to establish that a severe financial crisis existed as of the close of that year; the cash flow for that year was "pretty close" to even, earnings per share of stock continued in an upward trend, and projections indicated that, although additional financing was needed for 1973, the needed financing was thought to be obtainable. The evidence established that through September of 1973, Woodmoor was continuing negotiations for a development loan, it had a collateralization commitment, which included multi–family lot paper, contingent upon obtaining such a loan, and it continued to receive financing from several sources.

Because there is no evidence that as of September 14, 1973, the last date on which any plaintiff purchased a lot, the Woodmoor Corporation concealed information which its principals knew indicated an almost certain inability of the corporation to complete the promised improvements, the judgment that Woodmoor had fraudulently concealed information cannot stand.

We have reviewed the other contentions of error raised by Merchants and the errors asserted by plaintiffs in their cross–appeal, and conclude that, in light of our disposition of the issue of fraudulent concealment, those issues need not be individually addressed. We do note, however, that plaintiffs' cross–appeal from the directed verdict on the defense raised under the ILSFDA has no merit. Recovery on that theory

required a showing of conduct amounting to fraud or conduct which would operate as a fraud. The evidence failed to establish fraudulent intent on the part of the principals of the Woodmoor Corporation.

The judgment is reversed and the cause remanded with directions to dismiss the complaint and for further proceedings relative to Merchants' counterclaim seeking recovery on the notes.

SMITH and KELLY, JJ., concur.